*800 OPINION OF THE COURT
F. Dana Winslow, J.
Procedural Statement
This action for oral surgical malpractice was tried before the Supreme Court, Nassau County (Honorable F. Dana Winslow), without a jury, between May 8 and May 24, 2002. Defendant Gilbert L. Ross, M.D. settled with plaintiffs prior to trial for an undisclosed sum, and the action was voluntarily discontinued against defendant Long Island Jewish Medical Center. Both sides submitted proposed findings of fact and conclusions of law, together with a proposed verdict sheet, limited to the issues of liability and proximate cause only. After due consideration of the trial testimony and documentary evidence admitted at trial, the court hereby makes the following findings of fact and conclusions of law.
Factual Background
1. Treatment History.
Defendants Dr. Stephen A. Sachs and Dr. Michael H. Schwartz are board certified oral and maxillofacial surgeons practicing together at 2001 Marcus Avenue, Lake Success, New York, under the name of The New York Center for Orthognathic and Maxillofacial Surgery.
On December 20, 1990, plaintiff Susan Villano, then 37 years of age, presented to Dr. Schwartz with a six-year history of temporomandibular (TMJ) complaints, including chronic jaw pain, headaches and a progressive anterior open bite. She had been treated by a series of doctors and medical professionals— dentists, internists, nurses, residents, oral surgeons, orthodontists, otolaryngologists, obstetrician-gynecologists, head/neck surgeons, pain specialists and acupuncturists — and received treatment in the form of bite plates or splints, trigger injections and physical therapy, none of which provided relief from the pain and discomfort in her jaw and face. Her otolaryngologist ultimately referred her to Drs. Schwartz and Sachs.
At Susan Villano’s first office visit, Dr. Schwartz evaluated her, took X rays, and arrived at the impression that Mrs. Villano was suffering from TMJ disease. The X-ray studies also demonstrated atrophy in the temporomandibular joints. Dr. Schwartz’ impression was “that I was first going to find out if she had an internal derangement or problem within the joint itself, and, after that evaluation, send her for additional evaluations of the muscles of the area, and then consider closing her bite by surgery.” (Transcript at 1559-1563.)
*801 Dr. Schwartz referred Susan Villano for an MRI and evaluated her again on January 21, 1991. The radiographic studies and MRI demonstrated a “flattening of the [right] condylar head and anterior medial osteophyte consistent with degenerative changes,” which was thought to- be the primary cause of her progressive open bite (transcript at 630, 1559-1560, 1571). Susan Villano was then referred to Dr. Donald Tanenbaum, a specialist in nonsurgical temporomandibular joint problems and facial pain. When Mrs. Villano did not respond to various pain management techniques, Dr. Tanenbaum recommended corrective orthognathic surgery.
On June 19, 1991, Susan Villano was examined and evaluated by Dr. Sachs, who diagnosed a “functional skeletal deformity,” skeletal apertognathia (open bite) and “maxillary vertical excess” (transcript at 111-125, 1573). Drs. Schwartz and Sachs concurred that Susan Villano would benefit from corrective orthognathic surgery.
Dr. Schwartz directed Susan Villano to continue treatment for pain management with Dr. Tanenbaum pending the surgery. Mrs. Villano was also referred to an orthodontist, Dr. Stewart Grauer, to align Mrs. Villano’s teeth in preparation for surgery. Dr. Grauer attached corrective orthodontic braces to Susan Villano’s teeth, which remained in place over the period from 1991 through the time of surgery in 1993. During this period, Susan Villano saw Dr. Grauer every two weeks. The braces were effective in obtaining the proper presurgical alignment. In addition, Susan Villano was referred to a psychiatrist, Dr. Oliver, to prepare her for the mental rigors of recuperating from such a procedure, and to clear her for the procedure.
In total, Drs. Sachs and Schwartz met with Susan Villano on six occasions prior to surgery during the period from December 1990 through October 11, 1993. Drs. Schwartz and Sachs also took numerous X rays, made models of Susan Villano’s jaw and teeth, and performed mock “model” surgery. On September 8, 1993, at the offices of Drs. Sachs and Schwartz, Susan Villano submitted to a complete presurgical workup, which included bilateral osteotomies with advancement of the mandible (lower jaw), and a “LeForte I” with the repositioning of the maxilla (upper jaw), to correct her skeletal malocclusion and anterior open bite. Final workup and review were performed at the surgeons’ office on October 11,1993. The surgery was scheduled for October 19, 1993.
2. Preadmission Assessment and Surgical Clearance.
On October 13, 1993, Susan Villano went to the hospital, *802 Long Island Jewish Medical Center, for routine preadmission testing which included, inter alia, blood studies and a full chemistry profile, urinalysis, a chest X ray, EKG and a physical examination. According to plaintiffs, during the testing, an unidentified nurse informed them that there were antibodies in Susan Villano’s blood, which had been drawn several days earlier for autologous donation. The nurse informed plaintiffs that a second antibody test on a new blood sample was required for medical clearance. The nurse also apparently suggested that they request a “human blood growth hormone (HGH) test” from their primary care physician, because she noticed that Susan Villano’s “hands had looked large” (transcript at 916-923, 1401-1408, 1754-1757).
Plaintiffs met with Dr. Gilbert L. Ross, Mrs. Villano’s primary care physician, on the following day, October 14, 1993. A report of the previous day’s lab results was faxed to Dr. Ross, and plaintiffs informed Dr. Ross of the nurse’s instructions. Dr. Ross took a blood sample and had it delivered to the hospital for antibody retesting, as part of the medical clearance process. The results of this additional blood test were reported on October 14, 1993 and incorporated into the hospital chart. At the same time, Dr. Ross drew a second blood sample to test for human growth hormone. Dr. Ross sent this sample to a private laboratory in California, and told plaintiffs that it would take approximately five days to get the results, which would coincide with the scheduled surgery. Based upon his belief that the HGH test would have no bearing on the surgery, Dr. Ross cleared Susan Villano for surgery without first ascertaining the HGH test results or documenting the existence of the HGH test on the clearance form provided to Drs. Sachs and Schwartz. Further, although he allegedly promised to do so, Dr. Ross never orally informed Drs. Sachs and Schwartz about the HGH test prior to surgery.
3. The LeForte Surgery and Subsequent Complications.
The complex six-hour reconstructive jaw surgery proceeded as planned on October 19, 1993. While significant bleeding, facial swelling and ecchymosis was noted during and immediately following the surgery, Susan Villano apparently underwent general anesthesia without any reported complications. However, due to an inordinate amount of facial swelling and bleeding, her endotracheal intubation was maintained overnight after the surgery. Following endotracheal extubation the next day, excessive postsurgical swelling required the maintenance of Susan Villano’s nasopharyngeal airway (nasal trumpet) for five additional days. On the fifth *803 postoperative day (Oct. 24, 1993), believing that Mrs. Villano’s residual swelling had sufficiently subsided, Dr. Schwartz decided to permanently remove the nasopharyngeal tube from Mrs. Villano, whose mouth was completely wired shut following the surgery. Several hours later, however, Mrs. Villano’s airway obstructed and a “code” was called. When attempts to reintubate her nasally and orally were unsuccessful, an emergency cricothyroidotomy (i.e., intubation by passing a tube through the cricoid cartilage into the trachea) was performed to enable her to breath and establish a temporary airway. Dr. Mark Shikowitz, an ear, nose and throat surgeon, who had previously treated Mrs. Villano, then placed a formal tracheostomy in the area of the second and third rings of Mrs. Villano’s trachea to stabilize her airway, which remained for approximately two months. Plaintiffs contend that the trauma to Susan Villano’s trachea following the emergency cricothyroidotomy and formal tracheostomy was a substantial factor in the progressive development of Susan Villano’s tracheal stenosis and pulmonary disability, which they now believe to be permanent.
On October 25, 1993, Drs. Schwartz and Sachs telephoned Dr. Ross to inform him of Mrs. Villano’s postsurgical complication. Dr. Ross then informed them about the HGH test he had ordered. On the same day, Dr. Ross placed a handwritten note in Susan Villano’s hospital chart indicating that Susan Villano’s HGH levels were “slightly elevated” which may suggest acromegaly. (Transcript at 1482-1483.) Further testing led to a conclusive diagnosis of acromegaly on November 2, 1993.
The Controversy
Elevated levels of human growth hormone is an indicator of acromegaly, a rare condition which is known to stimulate jawbone growth and which could alter the results of highly complicated maxillofacial surgery. It is conceded by all parties that to proceed with elective jaw surgery, knowing that an HGH test had been ordered, or knowing or having reason to know that the patient had acromegaly, would be a departure from good and accepted oral surgical practice. In this case, there is no contention that Dr. Schwartz or Dr. Sachs performed the surgery improperly. The sole issue is whether or not the surgeons should have postponed surgery based upon their knowledge or reason to know that Susan Villano had manifestations of acromegaly, and, in the absence of any such knowledge or reason to know, whether the surgeons had a duty to routinely investigate the possibility of acromegaly.
*804 Findings of Fact
1. Susan Villano did not exhibit typical signs of acromegaly prior to surgery.
Acromegaly is characterized by enlarged facial features, enlarged jaw, enlarged frontal bone of the skull, widely spaced teeth, thickening of the soft tissues of the face, and enlargement of the bones of the extremities. Susan Villano’s presentation to Drs. Schwartz and Sachs was not typical of acromegaly, and was, in many ways, inconsistent with this condition. It is undisputed that she did not present with such classic signs as a large or thick tongue, prominent sub orbital ridges and forehead or spread teeth. In fact, Dr. Schwartz testified that he, together with Dr. Grauer (the orthodontist) and Dr. Tanenbaum (the TMJ specialist), had characterized the teeth in Mrs. Villano’s lower jaw as crowded.
Dr. Schwartz (and nonparty treating otolaryngologist Dr. Shikowitz) further testified that Susan Villano’s cephalogram findings and measurements were not consistent with acromegaly because “[t]he patient has a small lower jaw, crowded teeth, and degenerated condylar head in the joint, and a patient with acromegaly would have an increase in size of the lower jaw in all dimensions and spreading or flaring, separating of the lower teeth.” (Transcript at 1542-1543, 1579, 1997-2008.) He stated that “[y]ou would expect to see a generalized enlargement of the whole jaw including the temporomandibular joint, and in this patient there is a degenerative process going on.” (Transcript at 1543.) Dr. Schwartz did not consider acromegaly because “[s]he had a small lower jaw. She had crowded lower teeth. She had a long history of degenerative joint problems and pain, and it was inconsistent with acromegaly.” (Transcript at 1543-1544.)
Drs. Sachs, Schwartz and Shikowitz each testified that every aspect and condition of Susan Villano’s jaw was inconsistent with an acromegalic process. Even plaintiffs’ expert agreed that Susan Villano’s retrognathic jaw was inconsistent with what he believed to be one of the most common findings in acromegalic patients, a prognathic jaw. Susan Villano’s X rays demonstrated no growth of jaw, as would be expected with acromegaly. By tracing an X ray from December 20, 1990 and comparing it with an X ray from September 8, 1993, Drs. Sachs and Schwartz conclusively demonstrated that the size of the plaintiff’s jaw did not change between 1990 and 1993.
Susan Villano had degenerative condylar disease (the joint was degenerative, not growing as in acromegaly), and her facial *805 features were not indicative of acromegaly (i.e., coarse facial features). Additionally, an anterior open bite is “totally inconsistent” with acromegaly, as Dr. Schwartz testified that “[p]atients with acromegaly have large, generally enlarged protrusive mandibles, and she had a generally decreased size for the mandible in a protruding position. It’s opposite.” (Transcript at 1546, 1579.) Dr. Grauer’s records also included findings of “mandibular deficiency” (small lower jaw), open bite, “convex profile” and “transverse discrepancy” which are all inconsistent with acromegaly (transcript at 1589, 1583). The finding of “transverse discrepancy” (constricted or narrow upper jaw) is inconsistent with acromegaly “[b]ecause when you are having an excessive growth, it would be enlarging and not be narrow” (transcript at 1579-1583).
The symptoms of mild hypertension, an approximate 13-pound weight gain, and endometriosis displayed by Susan Villano during her treatment period with Drs. Sachs and Schwartz are generalized problems which are “not specific in any way to acromegaly” (transcript at 1545-1546, 1933).
The record contains insufficient evidence that Susan Villano’s hands and feet were appreciably enlarged at the time of the surgery. As indicated on Susan Villano’s medical clearance form, Dr. Ross’ presurgical examination included the patient’s “extremities.” Neither Dr. Ross nor any of Susan Villano’s other treating, consulting or examining physicians or dentists during the period from December 1990 to October 1993 ever noted or reported that Susan Villano had enlarged hands and feet. As Mr. Villano testified, many of the doctors shook Mrs. Villano’s hands and never noted any abnormality in their size (transcript at 1747-1748). Dr. Hilgen, the maxillofacial surgical resident that performed a review of systems on the morning of the surgery, including checking the pulses in Mrs. Villano’s hands and feet, noted no such abnormality (transcript at 1460-1470, 1602-1605, 1607-1608). Likewise, the nursing record from the morning of Susan Villano’s surgery included a note of a small scratch on Mrs. Villano’s right breast, as well as a scratch on her left hand, third finger, but contained no note of enlarged hands or feet. (Transcript at 1607-1608.) None of the medical records of these practitioners documented any complaints by plaintiffs pertaining to enlarged extremities. The only person alleged to have discerned this condition was an unidentified nurse, whose testimony and subsequent cross-examination, apparently, could not be obtained.
In fact, none of the signs of acromegaly was ever noted by the numerous physicians and health care providers who treated *806 or examined Susan Villano in the years prior to her surgery. For example, Dr. Grauer (orthodontist) examined Susan Villano every two weeks from 1991-1993, and Dr. Martin (obstetrician-gynecologist) saw the plaintiff on numerous occasions from 1982 onward, including the performance of three inpatient surgeries from 1990-1993. Despite substantial contact with Susan Villano, neither of these doctors, nor any others, noted any signs of acromegaly, nor ordered HGH testing. Dr. Shikowitz (otolaryngologist) testified that Susan Villano displayed none of the “presenting symptoms or complaints that are typical of a patient with acromegaly” in either 1989 or during separate examinations by himself and a nurse on August 4, 1993 (transcript at 1997-2008). Further, Susan Villano was also examined by numerous other medical personnel, including residents, nurses and anesthesiologists, none of whom ever noted any signs of acromegaly (see, e.g., transcript at 474-476, 935, 1417-1418, 1601). This medical history begs the question: if Susan Villano presented with any of the classic signs of acromegaly, how then did these signs elude all of her other treating and examining physicians?
The court concludes that Susan Villano did not exhibit any of the classic signs of acromegaly at any time prior to October 14, 1993, either because such signs did not exist or because they were not readily discernable as anything other than facets of Mrs. Villano’s generalized overweight condition or weight gain.
2. Prior to surgery, no health care professional provided information to Drs. Schwartz and Sachs that would provoke a suspicion of acromegaly.
It is undisputed that Dr. Gilbert Ross did not inform Drs. Schwartz and Sachs prior to surgery, either orally or on the medical clearance form, that he had ordered an HGH test for Susan Villano. Prior to surgery, there was no notation on Susan Villano’s hospital chart, either by Dr. Ross or by the hospital staff, that an HGH test had been ordered for Susan Villano. Further, as discussed above, none of the manifestations of acromegaly, or any complaints relating to such manifestations, were ever documented on any of the medical records reviewed by Drs. Schwartz and Sachs prior to surgery, including the hospital admission records, and the records of numerous treating and consulting physicians, specialists and other health care providers who attended Mrs. Villano from the 1980’s until the time of her surgery.
3. Susan Villano did not complain of enlarged hands and feet to Dr. Schwartz or Dr. Sachs.
*807 Plaintiffs fail to prove that Susan Villano ever complained to Dr. Schwartz or Dr. Sachs that her hands and feet had grown large. The only supporting evidence is Thomas Villano’s testimony that, at her first office visit to Dr. Schwartz on December 20, 1990, his wife complained that “her hands and feet had gotten fatter” (transcript at 875, 1347, 1360-1361, 1806). However, Susan Villano had no recollection of making such a complaint. Further, Drs. Schwartz and Sachs testified that they received no such complaints from plaintiff, and that, had they received such a complaint, (1) it would “send up bells and whistles” to immediately refer the plaintiff to an endocrinologist (transcript at 617, 1556-1557), and (2) the complaint would have been documented in their records (transcript at 837-838).
Thomas Villano’s testimony is undermined by his own concession that Susan Villano “thought she was getting fat” and by Susan Villano’s testimony that she did not pursue her concerns about her growing ring size and shoe size with her doctors because “I just thought I was getting older. * * * With age your bones get big.” (Transcript at 1351, 1815.) If Susan Villano attributed such changes to normal processes, then she would be unlikely to raise the issue with her medical doctors, let alone her oral surgeons.
In fact, from the 1980’s through her surgery in October 1993, Susan Villano was seen on numerous occasions by well over 20 physicians and health care providers of various kinds and specialties (dentists, internists, nurses, residents, oral surgeons, orthodontists, otolaryngologists, obstetrician-gynecologists, head/neck surgeons, pain specialists, and acupuncturists), and never once complained that her hands and feet had gotten larger. She admittedly made no complaints of her hands or feet enlarging or growing fatter to Dr. Goldofsky, Dr. Shikowitz, Dr. Cantor, Dr. Martin, Dr. Kaufman and Dr. Haze or their staffs (transcript at 1347-1351, 1371-1372, 1390, 1394, 1747-1748, 1807-1809, 2002-2003, 2109, 2112). She admittedly made no complaint to any medical personnel at Long Island College Hospital in 1990 or 1993 at her presurgical clearance testing for her three inpatient gynecological surgeries or her subsequent hospital stays (transcript at 1389-1390). She made no complaint to Dr. Tanenbaum, her TMJ specialist (transcript at 1371-1372) or to her orthodontist, Dr. Grauer (transcript at 1381) or to the four emergency room personnel who examined her at Long Island Jewish Medical Center on August 3, 1993 (transcript at 1381) *808 or to Dr. Hilgen, a maxillofacial surgical resident, and the nurse who examined her on the morning of the surgery (transcript at 1391-1393).
The proposition that Susan Villano made only a single complaint regarding her hands and feet to Dr. Schwartz, a jaw surgeon — but to virtually no one else[1] —is simply not credible (transcript at 1351, 1806-1809, 1815).
4. Thomas Villano did not clearly and specifically inform Drs. Schwartz and Sachs prior to surgery that an HGH test had been ordered for Susan Villano.
Plaintiffs also fail to prove that the surgeons had prior notice of the HGH test by virtue of statements made by Thomas Villano prior to surgery. Thomas Villano testified at trial that he advised Dr. Sachs on October 19, 1993, immediately prior to his wife’s surgery, that there was a problem with an antibody in his wife’s blood which had to be retested, and that a growth hormone test was also ordered for her. According to Thomas Villano, he asked Dr. Sachs if he was aware of these blood tests, which he was not, but Dr. Sachs assured him that it shouldn’t be a problem and that he would “check with Gil.” (Transcript at 937-939, 1731-1732.) Neither surgeon contacted Dr. Ross until October 25, 1993, six days after the surgery.
However, both Dr. Sachs and Dr. Schwartz testified that they were never told of the HGH test until after surgery. They testified that if they had been notified of the HGH test, they would have cancelled surgery until the results were returned “[b]ecause we know that there are potential problems to the patient if we were to move forward and she were to have a positive elevation of growth hormones.” (Transcript at 584-585, 1609.) Dr. Sachs testified that “there was no way that I would ever operate on a patient with acromegaly without the appropriate evaluation and treatment and controlling the disease, absolutely no way.” (Transcript at 584.) Plaintiffs’ expert conceded that it is common knowledge among oral surgeons at all levels of experience to postpone surgery if there is any suspicion regarding elevated growth hormone levels (transcript at 1949-1950).
The court notes that Thomas Villano was actively involved in all aspects of his wife’s medical and dental care and treatment, and was present and participated at each office visit, *809 hospitalization and consultation with his wife’s treating physicians and dentists. In view of this pattern of behavior, the court finds it credible that Thomas Villano would speak with Drs. Sachs and Schwartz about the previous day’s office visit with Dr. Ross, and the follow-up blood testing, to the extent that he believed it was significant.
However, Thomas Villano conceded during questioning that he may not have specifically mentioned the undisclosed HGH test to Dr. Sachs, and instead may have asked the surgeon about the presurgical testing only in general terms.
“the court: No. I’ll break it down and then you follow up with anything that you might have, Mr. Shaub. The question is, instead of being very specific about the HGH test in your conversation with Drs. Schwartz and Sachs, do you think you could have said, there was some sort of problem with the blood test and not be specific, and were not specific at all?[2]
“the witness: In other words, I could have told him about it, but not gone into specifics?
“the court: Yes. Did you do that?
“the witness: Yes. Did I say that right?
“the court: I don’t know if you said it right or wrong. Mr. Shaub, do you want to pursue this?
“mr. shaub: No.
“Q: So it’s possible?
“A: Yes.” (Transcript at 1425-1427.)
This concession contradicts Mr. Villano’s earlier testimony that he specifically referred to the growth hormone test. It is, however, consistent with Mr. Villano’s testimony that Dr. Ross had assured plaintiffs both that the HGH test would have no bearing on the surgery and that he would, nonetheless, mention it to the oral surgeons. If plaintiffs believed that the surgeons were informed about the HGH test, and that it was medically insignificant in relation to the surgery, then plaintiffs presumably would have little need to question the oral surgeons further, in any other than a general fashion.
*810 Mrs. Villano admittedly did not tell Dr. Sachs or Dr. Schwartz of the HGH test and testified that she did not overhear her husband’s presurgery conversation with the surgeons. Further, there was no record of this conversation in plaintiffs’ notes (which were taken in the hospital during the postoperative period). In contrast, there was a record of the conversations that plaintiffs had with Dr. Ross wherein Dr. Ross apologized for failing to inform the surgeons about the HGH test. The court inferred that if plaintiffs had considered Dr. Ross’ admission worthy of note, then they would have also noted Mr. Villano’s statement to the surgeons about the HGH test, and the fact that the surgeons disregarded it, had it occurred.
The court concludes that plaintiffs have failed to prove, by a fair preponderance of the credible evidence at trial, that either Dr. Sachs or Dr. Schwartz was clearly and specifically apprised of the HGH testing by Mr. Villano on October 19, 1993. The court believes that, perhaps, Mr. Villano thought he had so advised them, but the evidence demonstrates, at best, that Mr. Villano only asked the surgeons generally whether there were any problems with the presurgical blood testing.
Conclusions of Law
1. Drs. Schwartz and Sachs did not depart from good and accepted oral surgical practice in proceeding with the surgery on October 19, 1993.
To prove a prima facie case of oral dental malpractice, a plaintiff must show that (1) there was a deviation or departure from the requisite standard of dental practice, and (2) the departure from the requisite standard of practice was a proximate cause of the complained of injury. (Knutson v Sand, 282 AD2d 42 [2d Dept 2001].) In this case, it is undisputed that if Drs. Schwartz and Sachs were on notice of facts suggesting acromegaly, such as the fact that an HGH blood test was ordered for Susan Villano, then their malpractice would be established as a matter of law.
As set forth in the above findings of fact, the court determines that neither Dr. Schwartz nor Dr. Sachs had notice of any fact suggesting acromegaly prior to the surgery. Susan Villano exhibited no apparent manifestations of acromegaly and in several respects, her presentation was inconsistent with that condition. None of the health care professionals who treated or examined Mrs. Villano over the several years prior to surgery reported any fact that would trigger further inquiry. Finally, as finder of fact, the court has determined that neither Susan *811 Villano nor Thomas Villano ever informed Dr. Schwartz or Dr. Sachs, explicitly and specifically, of any fact that would raise the suspicion of acromegaly. Absent such notice, the surgeons cannot be found negligent based upon their proceeding with the surgery as scheduled.
2. Dr. Sachs and Dr. Schwartz did not depart from good and accepted oral surgical practice in failing to diagnose acromegaly in Susan Villano.
Acromegaly is an extremely rare condition, occurring in only 0.00006% of the population. Defendants’ expert, Dr. Schreiber, testified regarding the diagnostic elements of acromegaly and the difficulty in detecting this condition.
“[T]he first thing to think about is that acromegaly is a systemic condition that is characterized as being very slowly progressive or insidious, and for clinical manifestations to become obvious may take decades certainly years if not decades. And their clinical characteristics that are common may not present. * * * [I]t can take years before patients and/or family are going to note that some changes have occurred and those changes are — have been documented as taking 10, 15 to 20 years to be grossly obvious in terms of their manifestation.” (Transcript at 2167-2169.)
As discussed above, the classic signs of acromegaly did not present in this case. The conditions exhibited by Susan Villano were contrary to the typical presentation of acromegaly and were directly related to a common type of jaw dysfunction encountered in the defendants’ practice. As Dr. Sachs testified, “Acromegaly is a very rare disease. I see hundreds of patients like this [patient]. I see twenty-five new patients a month, and one-third of them have this problem.” (Transcript at 571, 578.) “Her facial morphology did not fit this pattern [acromegaly] whatsoever” (transcript at 616). “This is a very common skeletal facial abnormality that she presented with. This is not consistent with the morphology that we understand as being associated with acromegaly.” (Transcript at 407, 581.)
Indeed, if Drs. Sachs and Schwartz can be deemed negligent for having “missed” a diagnosis of acromegaly, then so must every other treating and examining physician and health care practitioner that saw Susan Villano in the period from 1985 through October 19, 1993.
3. Drs. Schwartz and Sachs did not depart from good and accepted oral surgical practice in failing to examine or test Susan Villano for the presence of acromegaly.
*812 In the absence of clinical signs or notice of facts suggesting acromegaly, a finding of liability can only be predicated on the court’s conclusion that an oral surgeon has a duty to undertake a global assessment of the patient — i.e., to routinely examine areas outside of the head/neck region, such as the hands and feet, or to routinely order HGH blood testing — in order to rule out this condition prior to surgery.
Plaintiffs’ expert did not describe such a standard of care. Dr. Kupfer never testified that good and accepted standards of oral surgical examinations require an oral surgeon to observe a patient’s hands and feet absent a specific complaint (see, e.g., transcript at 412-413, 2108, 2171-2174). Instead, during redirect examination, Dr. Kupfer testified that the defendant jaw surgeons, when presented with the complaints regarding plaintiff’s jaw, were required to inquire further “[b]ecause they would ascertain that her hands and feet and ring size were getting much larger.” (Transcript at 1974.) This conclusion consists of speculation reached by hindsight, and does not constitute legal proof. (See De Mayo v Yates Realty Corp., 35 AD2d 700 [1970]; Eraser Co. v Kaufman, 138 NYS2d 743 [1955].) It also fails to articulate an appropriate standard of practice from which the oral surgeons departed. If one takes the statement to its logical conclusion, then any time a condition affecting surgical risk is ultimately discovered, a surgeon should be held liable for failing to test for it, notwithstanding the lack of any provocation to do so prior to surgery.
Defendants’ expert, Dr. Schreiber, testified that the actions of Drs. Schwartz and Sachs were “totally within the standards for oral and maxillofacial surgeons” (transcript at 2144-2163, 2169-2174, 2180-2181): “[A]nything that’s done in medicine or dentistry is done on what we call evidence based. You have to have a legitimate reason or a suspicion in order to proceed in a particular fashion. If not, every workup would take hours and days and would lead nowhere in most cases. In terms of — so you have to have some clinical relevance, a complaint of some kind that will lead you down a particular direction. None of her oral and maxillofacial manifestations, which was the reason she presented to their office, were even vaguely related to the classic characteristics for acromegaly that we’re aware of. * * * Virtually all of her presentation to them was inconsistent with acromegaly.”
Dr. Schreiber further testified that “[i]t was absolutely reasonable for them to rely on Dr. Ross’ clearance” of the plaintiff. Her opinion was based on the fact “that as an oral and maxillo *813 facial surgeon or any other surgical specialist, whether it’s an orthopedic surgeon, any specialist is going to focus in on the area that they are working on. In terms of having general knowledge of the rest of the patient’s physiognomy, pathophysiology, we rely on the treating physician to clear them and/or to notify us of any factors that are going to be a factor that’s going to affect the surgical procedure and/or that are going to be at risk for the patient.” (Transcript at 2174-2179.)
Although acromegaly can seriously affect the outcome of maxillofacial surgery, its existence in the population is extremely rare. To require an oral surgeon to examine and test for every condition known to impact on surgical outcomes, no matter how rare, and despite the lack of provocation, would result in an unreasonable duplication of the presurgical clearance examination, which would be both wasteful of medical resources and unduly intrusive, to the patient. Accordingly, the court concludes that Dr. Schwartz and Dr. Sachs were not required to undertake a complete examination of Susan Villano, which would have included observation and measurement of her hands and feet, nor were they required to request an HGH blood test, absent any clinical manifestations of the condition, or notice of some kind, alerting them to the possibility of acromegaly.
Conclusion
In view of the court’s finding that neither Dr. Sachs nor Dr. Schwartz departed from any standard of good and accepted oral surgical practice, the court need not address the issue of proximate causation or apportionment of liability. The court determines that defendants are not liable for Susan Villano’s injuries and are entitled to judgment in their favor.

. Susan Villano alleged vaguely that she told Drs. Ross and Luks that her ring and shoe size were increasing prior to 1990, but no notations of such complaints were included in their treatment records (transcript at 1804-1806). Additionally, Mr. Villano only remembered her telling Dr. Schwartz.

2. The court notes that Mr. Villano displayed noticeable confusion in response to the questions of defense counsel on this issue, and the court intervened after prolonged attempts by defense counsel to repeat and rephrase the question. This is noteworthy only in the context of Mr. Villano’s overall testimony, during which he spoke with acuity, and displayed no difficulty answering complicated questions.